Good morning and may it please the court, David Bosian for Relator Lori Simpson. The question is whether the District Court erred in holding that Ms. Simpson did not qualify as an original source for purposes of the public disclosure bar of the Federal False Claims Act. We submit that in dismissing the complaint for lack of subject matter jurisdiction, the District Court misapplied the original source exception to the False Claims Act for two primary reasons. First, the District Court misapplied the original source exception by requiring Ms. Simpson have direct and independent knowledge of specific false statements, specifically that Bayer sent false and misleading communications to the DoD, and it is respectfully submitted that this position is contrary to this court's holding in nurse anesthetist decision. Second, the District Court erred in concluding that Ms. Simpson did not have direct and independent knowledge of the true state of facts. That is, that she did not have knowledge of the truth of information suggesting that when Bayer made its statements to the Department of Defense, that it knew those communications to be false and misleading. Which ones? You mean the 1999 ones? The 19, yes, the statements, well, there are two statements, there's a course, I would suggest, Your Honor, of misleading information that is alleged in the complaint that is, that is disseminated from. I understand, I'm just questioning whether what you've stated as two issues is not really one. Well, I would agree, Your Honor, that in so far as the District Court, I would suggest somewhat conflated the two, in that the issue of providing the false statements and the true state of facts, to me, are separate issues. In other words, under nurse anesthetist, it is respectfully suggested the opinion holds that . . . Correct, but you do not have direct knowledge. Right, okay, so if that's the true state, if that's the essential true state of facts, then your two issues, they're properly conflated. That's the only difficulty I'm having with your statement of what you have to decide. So I would suggest, I would argue, Your Honor, that the issue is the statements that were made by Baer to the Department of Defense, and the true state of facts is what Ms. Simpson can provide, and frankly, which is what the government does not have. The government knows of the statements that Baer has provided to it. What it does not know is the behind-the-scenes truth. What did Baer know when those statements were made? What did Ms. Simpson know when those statements were made? The statements that we've . . . What are the statements? What are the statements? What were the statements that induced the contract? Well, the two statements that are alleged that this court considered in its prior opinion were first a November 10, 1999 statement that there was no evidence to suggest that Bay Call causes more rhabdomyolysis than other statins, that it was a class effect. The true state of facts, I would suggest, Your Honor, is that at the time Baer's agent made that statement to the Department of Defense, in fact, Baer did know that there was evidence suggesting that this was not a class effect. In other words, that Bay Call did have a greater correlation of rhabdomyolysis as a side effect, or as a potentially deadly disease that went along with the drug, than other statins. And Ms. Simpson is a percipient witness with regard to that knowledge. And the reason she knows about it is because of her employment at Baer in a position that . . . Your Honor, the way you got the first time is you got past 12-6. Then the district court had to get down to the devils in the details. Correct. You just want to talk about what we wrote about as of the first time, which the footnotes make clear was simply sufficient to survive dismissal. Your Honor, I'm happy to discuss what Ms. Simpson knew about those statements at the time that I said . . . I don't care about 1999. I care about 2001. What did the government know as of 2001? What additional representations, if any, were made to get the extensions in 2001? And were those representations, if made, knowingly false? Well, I would . . . They were not . . . They simply didn't repeat 1999 with a lot of water over the dam. So I believe, Your Honor, that what the complaint describes for Ms. Simpson is that Baer operated in essentially disseminating information almost like a wheel with spokes. That there was a central hub of what's been termed marketing that had recognized that there were serious problems with regard to this drug, and as a matter of marketing, needed to respond to that because the problems that were arising were problems that are essentially market busting. The two issues were one that Baer . . . that Baer had a greater instance of rhabdomyolysis than its competing statins, which if known to buyers, including the Department of Defense, was essentially . . . The exchange in 2001 was the military contract officer saying there seemed to be a lot of problems with this drug, at least that's in the medical literature and the media and so forth and our own investigations, and Baer says, fine, we'll give you a deeper discount. I mean, a deeper discount because of the dangers? Because of the . . . because the military was thinking of switching statin drugs. Well, the military, Your Honor, ultimately . . . Because of these concerns that were out there. In terms of what happened, I mean, the government did in fact pull the contract, and the . . . when it was revealed what the true state of facts were, that when the government became aware of it, the contract was pulled and ultimately the drug was pulled. I thought Baer voluntarily withdrew the drug first. No, I believe that the contract was ended first. Mid-2001, it was just a few months, wasn't it? It was in close time. Okay. Yes. In any event, what Ms. Simpson is able to describe is the fact . . . she can provide what the government doesn't have. She can provide the fact that at the time and during the time that the contract negotiations for its entirety were going on, that Baer had endeavored to provide false and misleading information to the Department of Defense. And she knows that because she, as her job essentially, was in the hub of this communications network that pushed out counter-narrative arguments to those who would be purchasers of the drug. That included the Department of Defense, it included doctors, et cetera. Ms. Simpson was in fact asked to conduct an analysis related to the class effect by looking at adverse events reports to determine whether there was a greater correlation with, potentially, with Baycol and rhabdomyolysis versus other statins. And she in fact created an analysis and distributed it to the team at Baer that indicated a suggestion that there was in fact not a class effect . . . well, there may have been a class effect, but that Baycol was a greater instance of rhabdo than its competitors. And in fact . . . When this case went back on remand, he was still in the posture of a motion to dismiss, isn't that right? That's correct. Okay. And so, the district court said that your client was not an original source because she didn't know about the false statements to the government, and you say that's not required under nurse anesthetists, right? That's your first point. That is. That is your argument. Now, what's your second point that you say was error? Well, essentially that the district court treated the analysis of true state of facts and knowledge of the false statements differently because the theory of falsity in this case was premised on fraud and the inducement. So in other words, if we look at nurse anesthetists where this court looked at the true state of facts being what did the anesthesiologist assistants know was happening in the operating room, even though they didn't know what was being submitted to the government? And in that case, they were credited because they knew that what was happening in the real world in those operating rooms was not what was being . . . was not compliant with what was required for billing. So the analysis looked at the true state of the facts, comparing what statement was made to the government, that is that we are billing for a service that is provided in a certain manner, and what was happening in the real world. And what the nurse anesthetists were able to proffer or to allege in their complaint is that what was happening in the real world deviated. And the reason they knew that is because they were there. So too with Ms. Simpson. She knows from her experience that what was being presented to the federal government was not in fact what Bayer knew. So when Bayer was explaining to the federal government . . . I don't understand how you can say that without proof. By the way, this was a 12B1 dismissal, right? Correct, it was. So we're not limited to pleadings. The district court was not limited to pleadings. That's correct. Although I do believe the district court did base it on the pleadings. I don't recall . . . Well, that's fine, but it didn't have to. To the extent it went outside the pleadings and made fact findings in a dismissal, that's appropriate under 12B1. It is. The district court, however, essentially conflated the two. So we do have evidence. There is evidence alleged in this complaint that Ms. Simpson knew what was going on. And it's alleged in the fact that she participated in meetings where it was discussed. She knew that the very person that made the representation to the federal government, Mr. Zygmunt, who said there's no evidence to suggest that Bay Coll causes more rhabdo than others and that it's a class effect, he was the one that had contacted Ms. Simpson to get her analysis, which suggested exactly the opposite. So when that statement was made to the government that this was a class effect and that there was no greater instance, Ms. Simpson can narrate why that was not true. Similarly, for the instance of the dose response, she can do the same. And that's based on her personal direct and independent . . . Does the record reflect that that specific representation was made again in the 2001 negotiations? I don't believe it was necessarily represented. I don't believe it's in the complaint that it was necessarily re-represented. Well, what is represented in the complaint is that this was an ongoing course of communication. Bayer said you had to pivot your independent knowledge claim when you raised the DOD contract for the first time on the first appeal and that was the only thing that prevailed. And now you're back making the same independent knowledge argument that was necessary for the failed HHS claims. No, I would respectfully suggest that they're different, Your Honor. We're not re-litigating or re-arguing the prior claims at all. No, but the true state of facts you're talking about were the essence of the Medicare fraud claims that were dismissed. The 99, the whole business about Zygmunt and the marketing to doctors and so forth? I would respectfully disagree, Judge Logan. The statement from Mr. Zygmunt was to the Department of Defense. That was the statement. Okay, but it was in 1999. It was 1999. It was shortly . . . Okay, so what do we know about 2001 negotiations? Well, we do know that this continued. How do we know that? Because Ms. Simpson says this was part of, essentially, the disinformation that was disseminated from this central hub through various channels. What's the record site for Ms. Simpson saying that these representations to DOD continued into 2001? A502, she says the same strategy of minimizing safety and overstating efficacy was used for everyone, including the DOD. At paragraph 4, I believe, of the same, she says that she was a participant in strategy regarding the DOD contract and knew it was being sought and then continued to work on the DOD afterwards. She continued to learn more. That's at A507 about what Bayer knew and continued to gain more information about the state of the facts afterwards. Well, do you think the district court dismissed this on two alternative grounds? Is that what you're saying? Or do you think the district court dismissed it only because she didn't allege knowledge of statements made to the government? I think it's the latter, Your Honor, but I think that . . . Well, then you're confusing me by saying there's two errors. Well, perhaps I should restate it. The inquiry is that the district court analyzed whether or not the statements had been made to the government. They considered that the true state of the facts. So the error is both in misapplying nurse synapticists, which says you can be an original source by merely having knowledge of the true state of the facts. And then, in addition to that, the district court said, even taking that, that the true state of the facts are the false statements. And I am suggesting both that nurse synapticists separates those two inquiries and there is additional . . . the facts alleged indicate that the true state of the facts are what Ms. Simpson knew, that the statements Bayer made were knowingly false. Now, nurse synapticists was not a fraud in the inducement? It was not. And so what's your best fraud in the inducement case on this point? I don't have another fraud in the inducement case, but I would draw attention to the Newell case, which was a false certification case. And false certification is a similar theory to fraud in the inducement in that the false certification renders subsequent claims for payment to be false and misleading in the same way that fraud in the inducement renders subsequent claims false and misleading. I see that my time is up. Thank you. Mr. Hoflich. May it please the Court. Good morning, Your Honors. I'm Adam Hoflich, and I'm here on behalf of the Bayer defendants. The False Claims Act deprives courts of jurisdiction when the allegations have been publicly disclosed and the relator is not an original source of the information on which the allegations are based. Here, Ms. Simpson is not an original source of either the misrepresentations that were made to the government or any other of the essential facts of her case. In particular, Ms. Simpson is claiming that there were two inducements of contracts of the Department of Defense. One would be the contract extension for a Baycall agreement that was signed in 1999. The second would be a blanket purchase agreement for the .8 dose of the medicine that was signed in February of 2001. So the two contracts, the extension in January of 2001 and the blanket purchase agreement in February of 2001, are what is at issue here. And if I may, I'll turn first. I thought it was January and February. You just talked about 1999. You confused my limited knowledge of the facts. I apologize, Your Honor. The original Department of Defense contract was in 1999. The contract extension is . . . That's time barred or something? There's some reason that's not left in the case? That's correct, Your Honor. That claim is time barred. So that is no longer in the case. And if I may, Your Honor, let me . . . Then in January, that was renewed or extended? In January of 2001, there was an extension that was entered into between the Department of Defense and Bayer. And in February, there was a blanket purchase agreement for a dose of Baycol that hadn't been on the market in 1999. And I believe when we look at the blanket purchase agreement, the dose of Baycol that hadn't been on the market then, the complaint makes very clear that the relator is not an essential source of any essential element of her claim. For example, if I may take the Court's time, if we turn to paragraph 91 of the second amended complaint, and the relator is talking about information which she claims should have been disclosed to the government, part of this sort of spoke-and-wheel theory that she turns to, what does she say? Upon information and belief, there was no information provided to the Department of Defense that Bayer had determined such a team, and they're talking about a Baycol Rapid Response Team, was necessary or that Bayer was aware of safety issues with Baycol. So what's told to the government is on information and belief. In paragraph 94, Ms. Simpson says, on November 15, 2000, the Department of Defense, PEC... I'm sorry, Your Honor, page A250 of the record, paragraph... of the appendix. Paragraph 94. And the last sentence of paragraph 94 says, upon information and belief, and consistent with the Baycol marketing plans, Bayer neglected to tell DOD prescribers that head-to-head trials of Baycol versus Simvazatin did not show equivalency in LDL-C, that's a type of cholesterol, reduction at these doses. And that's November 15, 2000, a year after the allegations that were addressed in this court's prior opinion, which was November and December of 1999. Then in paragraph 96, Ms. Simpson turns to the contract extension. If we now turn to paragraph 190, and that's on page A278 of the appendix, Your Honor. Are you saying 8278 or... Page A, as in Adam, 278. 278. Paragraph 190 of the second amended complaint. Relator says, quote, while Relator did not discover that there was an actual concern or reason not to start patients on 0.8 dose until six months after the launch, and after a significant number of adverse events had been reported, Relator believes that this information was known to senior management prior to the launch of the 0.8 milligram dose. So, for example, with the blanket purchase agreement, the Relator is not only not an original source of the misrepresentations to the government, and she concedes that fact, but she is not an original source of what was or was not said to the government, and this court's cases, including Kinney and in Newell, make very clear that some information is not enough. There has to be a close connection between the information the Relator knows about and the state of facts at the time of the fraud, and here Ms. Simpson does not have knowledge of what actually transpired that led to either the contract extension in January of 2001 or the blanket purchase agreement in February of 2001, and the Supreme Court's opinion in Rockwell is very clear that one needs to know the information on which the allegations of fraudulent inducement are based. We believe, consistent with the Court's opinion in Mystic, and then Judge Alito was very clear that in a fraudulent misrepresentation case, the essential facts are the but even if that were not the case that's not the law of this circuit, is it? Your Honor, there is no conflict between the law of the circuit and Mystic. In this circuit, I believe that Kinney and Newell made clear, consistent with Rockwell's statement that we can't have jurisdiction in Gross, that some information is not enough. Were some information enough, in Newell, the knowledge of what happened at one HUD meeting and the Court made very clear that he would have to know what happened that led to the certifications of chronic noncompliance. Is this an alternative theory that was not relied upon by the District Court that you're advancing now? That's correct, Your Honor. The District Court So you're not defending the District Court's rationale that the plaintiff has to know about the transmission of the statements to the plaintiff? No, Your Honor. We believe that You believe that, but your argument so far has been on an alternative theory that the District Court didn't advance. Is that right? Just so I'm clear? No, Your Honor, and I apologize if I was unclear. First, we believe the relator needs to be an original source of the information on which the allegations are based. That's the misrepresentations to the government. Given that this is jurisdictional, the Court of Appeals may consider whatever it chooses in deciding whether it has jurisdiction. We believe that if the Court does not want to reach whether there's a circuit split with the Third Circuit, it can hold that this relator did not have knowledge of any essential facts, and we believe that under this Court's opinions in Kinney and Newell, it's very clear that she does not meet the test. In Kinney... Why should we do that? Why shouldn't we just review the District Court's rationale? And if the District Court was wrong, then send it back. Your Honor, the Court would have the ability to send it back for the District Court to make findings of fact in the first instance. Here, however, we believe it is clear that based on what is in Ms. Simpson's pleadings, that she does not know what the true state of facts were with respect to either of her fraudulent inducement allegations, and that the Court can hold as a matter of law. We could, but it seems like you're asking us to do what the District Court should be doing in the first instance, going through the whole complaint and making findings of fact and so forth. Your Honor, when the relator doesn't connect anything between November and December of 1999 and contracts that were entered into in January and February of 2001, I think it's appropriate for this Court to say that's not enough. The public disclosure bar ... I don't know. I mean, this first opinion says there was enough to connect them. Doesn't it? No, I don't believe the first opinion does, Your Honor. The first opinion says that a fraudulent inducement case is different for purposes of 9b than a case in which we're dealing with claims for payment. And the relator here doesn't need to show or have direct and independent knowledge of the claims for payment. She's excused from that. I don't believe that the Court of Appeals said that Ms. Simpson was an original source of what led to those two agreements. No, it didn't address the original source, but it addressed whether the 99 statements were connected to the alleged fraud in 01, didn't it? I don't believe the Court went that far and that certainly wasn't essential to the Court's holding, Your Honor. Well, it says in addition Simpson connected her allegations regarding alleged fraud to the 01 contract extension. That's the part I'm thinking of. I'm aware of the passage of the opinion, Your Honor, but I think what the Court is focused on is whether Ms. Simpson is alleging that there was an effort to induce an agreement with the Department of Defense. And then it says, for example, and points to paragraphs 105 to 120, but the Court does not hold that Ms. Simpson in fact links her statements to what happened in January and February of 2001 and sends that back to the District Court to determine the... It's just talking about the you know, it's alleged that then it is unlikely the DOD would have entered into the contract. That's what I'm reading from how the first opinion said that was connected from a pleading standpoint. There was no factual connection. There was no factual connection at all. You went back to sort out. There was no... The whole problem was the majority stopped analysis prematurely. Well, now we're going to step two. That's when you reverse a grant of a dismissal, then the case carries on. Yes, Your Honor. The dissent pointed out that the majority didn't look, for example, at whether there was any injury alleged. And the majority did not look at, for example, when Ms. Simpson says there were allegations about death, and that's in paragraph 112. It's also very clear, and this is in the appendix in Judge Davis' finding of facts in an earlier decision at page A-208 and 209, that Ms. Simpson conceded in her deposition that she didn't know of any deaths until at least the spring of 2001. Ms. Simpson also said in her deposition, and this is again at pages A-208 and 209, that she wasn't aware of any positive spin being put on the contraindication. So when the Court of Appeals points to paragraph 112, they're solely pointing to what is in there, not to whether there are other paragraphs in her complaint and in her deposition and in the record that are very clear that she's not an original source even of those facts, and that there are many other discussions that take place. A change in labeling happens. There are discussions with the Department of Defense where the Department of Defense asks questions about the number of cases of rhabdomyolysis within the DOD. There's no allegation whatsoever that Ms. Simpson has knowledge of, and let alone independent and direct knowledge, but she has no knowledge of what happened in the conversations with the Department of Defense. What about the . . . As I understand your answer to Judge Colleton, you are defending the basis upon which the district court ruled. Am I right? That's correct, Your Honor. Can you address this distinction? Why should we affirm on the approach that the district court took in distinguishing the fraud and the inducement claim? In Rockwell, the Supreme Court made clear that the test is whether the relator is an independent source of the information on which the allegations are based. In a fraudulent inducement case, the allegations on which the complaint is based are what happened in the conversations with the government. The relator is already being relieved of other requirements of 9B, and so now the question is . . . What other . . . Under 9B in this circuit, a relator is required to have representative examples of the claims submitted to the government. The relator is relieved of that here. In order to be an exception from the public disclosure bar, and this Court's decisions make very clear that the goal is to have a narrow exception, because for example, this Court has a recent decision in Miller v. Weston where a relator comes forward in an original source case with no knowledge of what happens in the representations of the government. But she comes forward early on before anyone has publicly disclosed the information, not after the medicine's been withdrawn, after the Department of Defense investigates, after a settlement's been reached with the Department of Defense. That doesn't take place. We're now talking with someone who comes forward five years after the alleged fraud, and after the alleged fraud has been discovered. And the question is, what should that person need to know to be an exception to the public disclosure bar? And the question is, do they have information of their allegations? And in Mystic, the Third Circuit, which looked at precisely this issue... But that was not a fraud in the inducement case. That was a fraudulent inducement case, Your Honor. Mystic was? Mystic was a fraudulent inducement case. And the Court said in that case, the relator needs to know the essential elements of the fraudulent misrepresentations that were made for the government. In a subsequent case, the Third Circuit did what I suggest the Court could do here, which is that the relator hasn't pled any of the essential elements, so we don't need to reach that issue. Here, Ms. Simpson can't connect any particular statements to the fraud. And in fact, Ms. Simpson is in a position where she doesn't have knowledge of what happened. And no matter how one reads NERF's synesthetists, it doesn't relieve the relator of at least knowing what happened. In fact, in Rockwell, the Supreme Court pointed out that the relator there, Stone, didn't have direct knowledge of the representations as well. And we think that case governs. Thank you, Your Honor. I see I'm out of time. I'll give you two minutes for rebuttal if you'd like. Your Honor, the central question remains, did the District Court faithfully apply NERF's synesthetists? And I submit again that it did not. The District Court essentially changed the NERF's synesthetists holding, which says that a relator can meet the original source exception to the public disclosure bar when the relator has direct and independent knowledge of the true state of facts, even if the relator does not have direct and independent knowledge of the false statements themselves. That analysis does not change in instances of fraud and the inducement, and there is nothing to suggest otherwise in the False Claims Act. The analysis remains the same. It is the same analysis whether the case is predicated on billing for services that didn't happen, whether it's predicated on false certifications, it remains the same. And ultimately, that is the error of the District Court here, demanding that Ms. Simpson have direct and independent knowledge of the false statements. What Ms. Simpson does have direct and independent knowledge of is what was happening behind the scenes, what the government doesn't know. Counsel said that it's required that under this analysis that the relator be essentially a percipient witness to the false statements. And I would suggest that that runs counter to the basic ideas and balance of the False Claims Act. The government knows what happened in the conversations between Behr and their representative. They know because they were a party to it. What they don't know is what Behr knew, independent of that, that suggests those statements were false. And that, I submit to the Court, is what gives our position advantage as an insider at Behr, as somebody who participated in conversations about the creation of false messages that were designed to overcome serious concerns about the clinical safety and advocacy of Baycall that would have been essentially market-busting for this company. Thank you. Thank you, Counsel. The case has been thoroughly and well briefed and argued, and we'll take it as it comes.